IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| STATIC CONTROL COMPONENTS, INC., | ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) | |
| v. | ) ) | 1:06CV00730 |
| FUTURE GRAPHICS, LLC, | ) ) | |
| Defendant. | ) ) ) | |

MEMORANDUM OPINION

TILLEY, District Judge

This matter is currently before the Court on Plaintiff Static Control Components, Inc.'s ("SCC") Motion for Temporary Restraining Order and Preliminary Injunction [Doc. #5] seeking to restrain Defendant Future Graphics, LLC ("Future Graphics") from employing a former SCC employee. For the reasons set forth below, the Motion for Temporary Restraining Order and Preliminary Injunction is DENIED.

I.

This case arises out of a dispute between SCC and Future Graphics regarding Future Graphic's employment of Fred McIntosh, a former SCC employee. SCC asserts that Mr. McIntosh signed a "Confidentiality, Agreement Not to Compete, and Assignment of Inventions" (the "Agreement") as a condition of his employment with SCC. The Agreement prohibited Mr. McIntosh from competing

with SCC for a period of one year after his employment with SCC ended and also prohibited Mr. McIntosh from ever disclosing any confidential SCC information.

Mr. McIntosh was "laid off" from SCC on April 21, 2006 and reported to his first day of work at Future Graphics on June 19, 2006. SCC filed this action asserting a claim for tortious interference with contract asserting that Future Graphics was aware of the Agreement when it hired Mr. McIntosh. SCC seeks a temporary restraining order, a preliminary injunction, money damages, and other appropriate relief.

II.

In determining whether to enter a preliminary injunction or a temporary restraining order, courts in the Fourth Circuit apply the analytical framework first established in <u>Blackwelder Furniture Co. v. Seilig Mfg. Co.</u>, 550 F.2d 189 (4th Cir.1977), and more recently outlined in <u>Direx Israel, Ltd. v. Breakthrough Med. Corp.</u>, 952 F.2d 802 (4th Cir.1991). Under this framework, the courts apply a four-factor balancing test: (1) "the likelihood of irreparable harm to the plaintiff if [relief] is denied"; (2) "the likelihood of harm to the defendant if the requested relief is granted"; (3) "the likelihood that the plaintiff will succeed on the merits"; and (4) the public interest. <u>Id.</u> at 812.

Courts must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of

2

harm to the defendant.  Id.   As the balance tips in favor of finding irreparable harm to the plaintiff, there is a lesser need for the plaintiff to establish likelihood of success on the merits. Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir.1991).

A.

SCC claims that without a preliminary injunction, SCC will lose customers to Future Graphics as a result of Mr. McIntosh's employment at Future Graphics.  In support of its motion, SCC refers to an industry advertisement in which Future Graphics announced its employment of Mr. McIntosh and stated that Mr. McIntosh was formerly employed by SCC. [Doc. #1, ex. D].  Future Graphics also sent an email press release informing recipients that Future Graphics had hired Mr. McIntosh, that Mr. McIntosh had previously served as the Product Development Manager at SCC, and also described Mr. McIntosh's duties at SCC.  [Doc. #12, ex. 4]. SCC also presented affidavit testimony that Mr. McIntosh entertained customers at an industry trade show in Las Vegas.  [Doc. #16, exs. 2, 3].

With respect to the harm to Future Graphics upon entry of injunctive relief, Future Graphics presented affidavit testimony that if Mr. McIntosh were prohibited from working for Future Graphics, it would have to restructure its technical department and would suffer an "irreparable blow to [its] business credibility and reputation" due to the prominence of Mr. McIntosh's employment in their recent ad campaign. [Doc. #12, ¶¶ 17-18].  Future Graphics also presented evidence of the

3

harm entry of injunctive relief would have on Mr. McIntosh, a non-party to this action, who has relocated his family to California to accept employment with Future Graphics. [Doc. # 10, ¶¶19-20]. In further support of its assertion that injunctive relief should not be granted, Future Graphics points to the fact that SCC had known for two months that Mr. McIntosh was working for Future Graphics before seeking the injunctive relief at issue. [Doc. #14 at 1-3].

With respect to loss of customers, this court has previously noted that "[w]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." R.J. Reynolds Tobacco Co. v. Philip Morris, Inc., 60 F. Supp. 2d 502, 509 (M.D.N.C.1999) (citations omitted). In this case, however, SCC has not presented any admissible evidence to support a claim that it has lost customers or even that it will lose customers as a result of Mr. McIntosh's employment. The fact that Mr. McIntosh attended a trade show in Las Vegas, along with numerous other Future Graphics employees, is simply insufficient to establish that Mr. McIntosh's employment with Future Graphics will cause SCC to lose customers. To the contrary, Mr. McIntosh's affidavit testimony regarding client contacts is undisputed: "Since I have been employed at Future Graphics, my only communications with remanufacturing companies (of the type that form the customer base for both Future Graphics and Static Control) have been with companies that had a pre-existing sales relationship with Future Graphics . . . . I

4

have not had any professional communications with any customer of Static Control that was not also a preexisting customer of Future Graphics." [Doc. #20, ¶ 6]. Indeed, at the hearing on this matter, James Jones, an SCC employee agreed that there is an overlap between SCC and Future Graphics customers.

In addition, SCC has also asserted that absent the entry of an injunction, there is a risk that its confidential and propriety business information will be disclosed to a chief competitor. To the extent SCC's confidential information constitutes a trade secret, this Court has recognized that "courts presume irreparable harm where a trade secret has been misappropriated." Merck & Co. Inc. v. Lyon, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996). However, this is not a situation where Mr. McIntosh was planning to leave SCC for its competitor and over a period of months "confiscated mailing lists, computer disks with confidential information on clients" or any other SCC information that could be used against SCC. See UBS Painwebber, Inc. v Aiken, 197 F. Supp. 2d 436, 442 (W.D.N.C. 2002) (citations omitted). Rather, Mr. McIntosh was "laid off" by SCC, returned his company provided laptop and all other "documents, data and other materials" to SCC the day he was terminated, and was unemployed for several months before accepting a position in his field of expertise.

Finally, it is undisputed that SCC knew of Mr. McIntosh's employment for some time before filing the instant motion. Based on the information currently before the Court, SCC learned that Mr. McIntosh had been hired by Future

5

Graphics as early as June 9, 2006[1] and at the latest by July 2006.[2] However, SCC did not file the complaint in this action and the motion seeking injunctive relief until September 1, 2006 - a delay of 8 to 12 weeks. The Eastern District of North Carolina has found a "six to nine week delay between plaintiff's discovery of defendant's competitive activities and its filing suit weighs against injunctive relief" because such a delay was indicative of a "lack of imminent and irreparable harm to the plaintiff." Southtech Orthopedics, Inc. v. Dingus, 428 F. Supp. 2d 410, 420-21 (E.D.N.C. 2006) ("Where plaintiff's actions tend to undercut the necessity of [enforcing the] very right contemplated by the contract, the court is reluctant to grant such an extraordinary remedy as a preliminary injunction, which is justified only when the urgency of preventing irreparable harm to plaintiff overshadows the fairness to defendant of awaiting final judgment on the merits.").

On these facts, the potential harm to SCC without entry of an injunction, when weighed against the potential harm to Future Graphics if injunctive relief is granted, does not tip decidedly in favor of SCC. Therefore, it is necessary to

---

[1] On June 9, 2006, William London of SCC sent a letter to Mr. McIntosh regarding "a rumor to the effect that you are now working, directly or indirectly, for a competitor." [Doc. #10, ex. 2].

[2] At the injunction hearing, Mr. Jones testified that he learned Mr. McIntosh had been hired by Future Graphics through an industry publication. When questioned on cross-examination about an email notification that was sent on June 19, 2006, Mr. Jones responded, "There or July would be good. I'm not certain." In addition, Mr. Jones testified that he had seen an advertisement in an industry publication that was dated August 2006.

determine whether SCC can establish a likelihood of success on the merits of its tortious interference claim. Direx Israel, 952 F.2d at 813 (quoting Rum Creek, 926 F.2d at 359) (explaining that where the balance of harm "'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.").

B.

SCC asserts that it is likely to succeed on its claim for tortious interference with contract against Future Graphics. Under North Carolina law, the elements of tortious interference with contract are "(1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of the contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts were committed without justification; and (5) actual damage to the plaintiff." Barker v. Kimberly-Clark Corp., 136 N.C. App. 455, 462, 524 S.E.2d 821, 826 (2000) (citing Childress v. Abeles, 240 N.C. 667, 674, 84 S.E.2d 176, 181-82 (1954)).

Future Graphics asserts that SCC cannot state a claim for tortious interference, in part, because the covenant not to compete that was signed by Mr. McIntosh is not a valid contract. For a covenant not to compete to be valid under

7

North Carolina law, it must be: (1) in writing; (2) a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) advance a legitimate business interest of the employer. Farr Assocs., Inc. v. Baskin, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000). Specifically, Future Graphics asserts that there is no consideration for the covenant not to compete because it was signed after Mr. McIntosh had accepted an offer of employment from SCC. Future Graphics asserts that under North Carolina law, where an offer of employment has been made and accepted prior to the signing of a written employment contract, a non-compete contained in a subsequent written contact is not supported by consideration *unless* it was agreed to at the time of the original offer and acceptance.

In Young v. Mastrom, the North Carolina Court of Appeals held that where the parties enter into a verbal employment agreement that does not include discussion of a covenant not to compete, a covenant signed on the first day of work, absent additional consideration, is void for lack of consideration:

> If the employment relationship already exists, a future covenant must be based on new consideration. This Court has also held that if a covenant is part of an original verbal employment contract, it will be considered to be based on valuable consideration. It is immaterial that the written contract is executed after the employee starts to work. However, the terms of a verbal covenant which is later reduced to writing must have been agreed upon at the time of employment in order for the later written covenant to be valid and enforceable.

99 N.C. App. 120, 123, 392 S.E.2d 446, 448 (1990) (citations omitted); Stevenson v. Parsons, 96 N.C. App. 93, 97, 384 S.E.2d 291, 293 (1989)

8

(explaining that "an oral covenant later executed in writing must have been agreed upon at the time of employment in order for the latter written covenant to be enforceable").

In this case, there appears to be an issue of fact regarding when Mr. McIntosh's employment with SCC began. In Young, the trial court, acting as finder of fact, found that based on the evidence in that case employment began on the date the employee plaintiffs verbally accepted employment offers. Id. at 121-22, 392 S.E. 2d at 447. Other cases have similarly found that when employment began was an issue of fact for a jury. Reynolds v. Tart, 955 F. Supp. 547 (W.D.N.C. 1997) (finding fact issue precluded the entry of summary judgment).

In Reynolds, the defendant employees had presented affidavits that offers of employment were made and accepted prior to their first day of work, which is when the covenants were signed. Id. at 555. The plaintiff presented written and dated employment contracts and an affidavit from a company representative that the defendants had been hired on the dates stated in their employment contracts. Id. The defendants had also presented uncontroverted evidence that the issue of covenants not to compete was not discussed during the meetings that occurred prior to the defendants first day of work. Id. On these facts the court held that whether "the covenants were simultaneous to or subsequent to employment is a question for the jury." Id.

In the preliminary injunction scenario, similar facts have weighed against the

9

employer's likelihood of success on the merits. Southtech Orthopedics, 428 F. Supp. 2d at 421-22 (considering factual dispute regarding "whether there was a valid offer and acceptance of employment prior to defendant's signing the employment agreement on his first day of work" as one factor in determining that employer had not demonstrated "a strong probability of success on the merits"); Cannon Servs. v. Culhane, No. Civ. 04-1597ADM/AJB, 2004 WL 950414, at *3 (D. Minn. Apr. 30, 2004) (holding that employer had not shown a "probability of success on the breach of covenant claim" where employee had accepted employment and was not informed of covenant until first day of work); Texlon Corp. v. Hoffman, 720 F. Supp. 657, 662 (N.D. Ill. 1989) (holding that employer had not demonstrated likelihood of success on the merits where it was undisputed that employee was not informed he would need to execute a covenant not to compete prior to his acceptance of employment offer and was presented with covenant on first day of work).

Here, Mr. McIntosh has submitted an affidavit asserting that he "accepted the job offer from Mr. Huffman [former Director of Engineering Services at SCC]." [Doc. #10, ¶6]. His affidavit does not state a particular date on which he accepted the offer but indicates that it was prior to his first day at SCC because he accepted the offer, quit his prior job, and moved to Sanford prior to his first day at SCC. [Id.]. Mr. Huffman has also submitted an affidavit stating that "Mr. McIntosh accepted the job offer" after receiving a written offer letter. [Doc. #11, ¶¶5-6].

10

While Mr. Huffman's affidavit does not state a particular date on which Mr. McIntosh accepted the job offer, it appears that the acceptance was prior to Mr. McIntosh's first day at SCC. Mr. McIntosh and Mr. Huffman both state that a covenant not to compete was not discussed in their conversations regarding employment with SCC prior to Mr. McIntosh's acceptance of the job offer. [Doc. #10, ¶7; #11, ¶7]. Whether the covenant not to compete was signed before or after Mr. McIntosh began work at SCC is a question of fact that must be decided by a jury. Since it cannot be said, at this point, that the covenant not to compete is an enforceable contract, SCC cannot establish a likelihood of success on the merits of its tortious interference with contract claim.

C.

The final Blackwelder factor to be evaluated is the public interest. SCC asserts that entry of a temporary restraining order in this matter is in the public interest because "it will protect the ability of a North Carolina entity to protect its contract rights, protect its confidential information and prevent competitor from misappropriating that information by means of tortious interference with its contracts with its employees or former employees." [Doc. #4, at 7]. North Carolina courts have recognized that the "protection of customer relations against misappropriation by a department employee" is a legitimate business interest of an employer. Farr Assocs., 138 N.C. App. at 280, 530 S.E.2d at 881.

Future Graphics, on the other hand, asserts that competition between

11

businesses is in the public interest and also asserts that competition in business constitutes justifiable interference in another's business relations. See Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 220, 367 S.E.2d 647, 650 (1988) (noting that "public policy demands that absent some monopolistic purpose everyone has the right to offer better terms to another's employee, so long as the latter is free to leave").

If the Agreement is enforceable, public interest would favor granting the injunction because the public has an interest in enforcing covenants not to compete that protect business interests. However, if the Agreement is not enforceable for lack of consideration, entering injunctive relief in this in this matter would not be in the public interest. If Mr. McIntosh were in fact free to accept employment with Future Graphics, the public would certainly have an interest in businesses being free to compete for the "best and brightest" employees. Thus, as with the likelihood of success on the merits factor, the public interest factor cannot be decided at this stage in the proceedings.

IV.

For the reasons discussed above, SCC's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. #5] regarding Mr. McIntosh's employment with Future Graphics is DENIED.

In addition to the injunctive relief sought regarding Mr. McIntosh's employment, SCC also seeks entry of an order enjoining Future Graphics from

12

soliciting any other SCC employees for employment within one year after they have left the employ of SCC. The record does not support the issuance of such blanket injunctive relief. SCC's Motion for Temporary Restraining Order and Preliminary Injunction regarding Future Graphics' solicitation of any other current or former SCC employees is, therefore, DENIED.

This the day of May 11, 2007

/s/ N. Carlton Tilley, Jr.<br>
United States District Judge